## COMMONWEALTH *vs.* RUSS M. DAGENAIS.

Essex. January 11, 2002. - October 22, 2002.

Present: MARSHALL, C.J., SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Self-incrimination, Right to obtain testimony. *Evidence,* Photograph, Consciousness of guilt. *Homicide. Practice, Criminal,* Instructions to jury, Capital case.

At a murder trial, the judge did not err in allowing a defense witness to invoke his privilege against self-incrimination, allegedly depriving the defendant of his right to prove a defense, where the defense witness's proffered testimony would have given the Commonwealth an opportunity to inquire about (and demonstrate) the witness's mental and perceptive abilities, as well as any bias toward the police in general or the detective who was involved in a pending trial against the witness for murder of a police officer at which the witness planned to assert a mental incapacity defense. [838-840]

At a murder trial, there was no abuse of discretion in the judge's admitting in evidence seven autopsy photographs, where all the photographs were probative of the manner and cause of the victim's death. [840-841]

At a murder trial, the judge did not err in failing to give an instruction on involuntary manslaughter, where it was clear from the evidence that the risk to the victim was nothing less than a plain and strong likelihood that death would follow from the defendant's conduct. [842-843]

Where the judge at a murder trial correctly instructed the jury on consciousness of guilt and deliberate premeditation, the judge did not err in declining to further instruct the jury that consciousness of guilt evidence could not be used to infer premeditation. [843-844]

INDICTMENT found and returned in the Superior Court Department on June 19, 1996.

The case was tried before *Richard E. Welch, III,* J.

*Stephen Neyman* for the defendant.

*Gregory I. Massing,* Assistant District Attorney (*Gerald P. Shea,* Assistant District Attorney, with him) for the Commonwealth.

SOSMAN, J. The defendant was convicted of murder in the first degree on a theory of deliberate premeditation. On appeal, he

claims that the trial judge erred in (1) allowing a potential defense witness to invoke his privilege against self-incrimination, (2) admitting in evidence various autopsy photographs, (3) failing to give an instruction on involuntary manslaughter, and (4) failing to instruct that consciousness of guilt evidence could not be used to infer premeditation.[1] The defendant also asks that we exercise our power under G. L. c. 278, § 33E, to reduce his degree of guilt or grant him a new trial. We affirm the conviction, and decline to grant relief under G. L. c. 278, § 33E.

1. *Facts.* The facts viewed in the light most favorable to the Commonwealth are as follows. The victim was employed as a certified nurse's aide in a nursing home in Haverhill while studying nursing at a State hospital. She had previously dated and lived with the defendant, had broken up with him in February, 1995, and obtained a protective order against him in September, 1995. On Saturday, January 13, 1996, the victim arrived at work at about 3 P.M. At about 9:30 P.M., she called her then boy friend to tell him that she was leaving work and would be arriving shortly at his home. She "punched out" at 9:26 P.M., but she never arrived at her boy friend's apartment.

Nicole Mattie, another certified aide at the same nursing home, had started dating the defendant shortly after he and the victim stopped seeing each other, and was still dating the defendant at the time of the victim's disappearance. Mattie and the defendant had "[a] lot" of arguments regarding his prior relationship with the victim. He said that he "really hated" the victim, "just wanted to cut her up in little pieces," "wanted her out of [their] lives," and "wish[ed] she were dead." During a telephone conversation in December, 1995, the defendant asked

---

[1]The defendant also asks us to use our superintendence powers under G. L. c. 211, § 3, to promulgate a rule "requiring the immediate preparation of transcripts in first degree murder cases." While delay in transcript preparation is a matter of grave concern, the promulgation of a rule on the subject is beyond the purview of this opinion. In this case, the tape recording of the first day of trial, during which jurors were empanelled, was inadvertently lost. The "uneventful" proceedings of the first day of trial were ultimately reconstructed, but the preparation of the complete trial transcript was regrettably delayed. The defendant does not allege, nor do we find, any prejudice to his appeal from the delay in the preparation of the trial transcripts. See *Commonwealth* v. *Libby*, 411 Mass. 177, 178-179 (1991).

Mattie about the victim's work schedule and told her that he was planning to steal the victim's automobile, a red Chevrolet Cavalier. That same night, the defendant went to the nursing home and stole the red Cavalier, using a set of keys that the victim had given him while they were dating. He later gave Mattie some of the victim's possessions that were inside the car. He left the car in a parking lot located near his grandmother's house in Lynn, where he was living at the time. Following the theft, the victim rented a car (a white Geo Prism), and she had driven that rental car to work on January 13, 1996, the night of her disappearance.

Mattie was working a double shift that night, remaining at the nursing home until the following morning. At 3 A.M., while still on duty, she received a telephone call from the defendant. He sounded "very upset" and kept saying that "Carrie had an accident." He told Mattie that Eric Kneeland (a friend of his) and several others had waited for the victim outside the nursing home, followed her to her boy friend's apartment, waited outside until she "came out" of the apartment, and abducted her in order to "scare her." The victim had struggled, and managed to rip a mask off one of the assailants. The men then wrapped duct tape around the victim's eyes, mouth, hands and legs; placed eighty pounds of weights in her jacket; and drove her to a bridge over a river.[2] The defendant then told Mattie that Kneeland and his companions hung the victim over the side of the bridge and dropped her. She struck her head on the side of the bridge during the fall. When she did not resurface, the men left. The defendant claimed that he had been at home the entire time and had not been present during any part of the incident, but that Kneeland had called him afterward to tell him what happened.[3] The defendant expressed some doubt as to whether Kneeland's story was true, and asked Mattie to check the next day to see whether the victim showed up at work. He also told her that she "couldn't say anything" about the story.

---

[2]Mattie was unsure whether the defendant was referring to the Merrimack River or the Lawrence River.

[3]Kneeland testified that he was at home with his parents on the night in question and had not left the house during that entire night. Kneeland's mother also testified that her son did not leave the house on the night of the victim's disappearance.

When Mattie returned to work Sunday afternoon, January 14, she noticed that the victim had not punched in her timecard and had not "call[ed] in." Both Mattie and a coworker noticed the victim's stolen red Cavalier parked on the street near the nursing home. Mattie and her coworker then notified the police of the appearance of the stolen car and told them that the victim had not come to work that day.

Mattie spoke with the defendant on Sunday night, and met with him on Monday night, January 15. She told him that her coworkers suspected that he had done something to the victim. In response, the defendant told her that he was "just going to have to leave" and that he intended to go to Florida by train. Mattie told the defendant that she wanted to inform the police of what he had told her concerning Kneeland's assault on the victim. The defendant told her not to, because Kneeland was aware that he had told her about the incident and that he, the defendant, could not "protect" her from Kneeland and his friends.

Mattie next heard from the defendant on Tuesday, January 16. He called from Virginia and told her that he and Kneeland had driven the victim's rental car to New York, but that they had separated there. Kneeland had allegedly kept the car while the defendant proceeded on by train.[4] When Mattie told the defendant that she was going to contact the police, he became very upset, again warning that he could not "protect" her, and urged her to come to Virginia. Mattie then told him that she had already contacted the police,[5] to which he replied that she "was going to put his face on every milk carton."

Following her telephone conversation with the defendant, Mattie contacted the police and told them about the telephone conversation she had had with the defendant the night of the victim's disappearance. The police went to the defendant's grandmother's house. The grandmother advised them that the defendant had moved out. With her permission, they searched

[4]Kneeland testified that he made no such trip with the defendant, had worked at his regular job that entire week, and produced his time sheets from work reflecting the hours he had worked that week.

[5]At that point, the only information Mattie had given to the police pertained to the discovery of the stolen car and the victim's failure to report to work.

the room previously occupied by the defendant and found some of the victim's nursing books.[6] A warrant was issued for the defendant's arrest on charges stemming from the stolen vehicle.

On January 22, the Haverhill police were contacted by the police in Daytona Beach, Florida, informing them that the defendant had turned himself in. Two detectives flew to Florida to interview the defendant. When they saw the defendant, they read him his Miranda rights and told him that they were investigating the victim's disappearance. The defendant asked whether he should speak to a lawyer. One of the detectives replied, "It's your call. I can't make that decision for you." The defendant agreed to speak to the detectives, and signed a written waiver form.[7]

Initially, the defendant claimed that he had traveled to Florida by train and bus. In apparent response to the detective's inquiry as to the victim's whereabouts, the defendant replied, "Oh, yeah, I kidnapped [the victim] and threw her off the London Bridge." The defendant claimed that, on the night of January 13, he had driven the victim's red Cavalier to the nursing home, met up with her there, and gone off with her in her rental car. They argued about various things (including her alleged protest that he "hadn't gotten rid of [the stolen car] for her" and his concern about her upcoming testimony in two pending cases). They stopped on a "high" bridge over the Merrimack River[8]; both of them got out of the car; and the arguments continued. The defendant asked the victim to testify in his favor in his upcoming cases, but the victim refused. The defendant claimed that the victim was sitting on a stone ledge on the side of the bridge and that she was getting "hysterical." He approached her, but she started backing up, with her hands up in front of her, telling the defendant to stay away. The defendant claimed that he did not touch her ("There was never any contact" and

---

[6]The radio from the victim's red Cavalier was found in a subsequent search of the house.

[7]Prior to trial, the defendant moved to suppress his statement to the detectives. That motion was denied. On appeal, the defendant does not challenge the denial of his motion to suppress. As such, we review the motion judge's ruling under G. L. c. 278, § 33E.

[8]At the end of the statement, the defendant identified a specific bridge in Lawrence on a main thoroughfare as the location at which they had stopped.

he "wasn't close enough" to reach her), but that the victim "lost her grip" and "went backwards over into the river," screaming as she fell. He looked down, but could not see her, and did not see her come back to the surface. He went home frightened and telephoned Mattie. The "story" he told her was "made up." He did not contact the police, because he knew that Mattie would do so and he "kept hoping [the victim] would pop up, in shock but alive." The defendant claimed that he had been planning to go to Florida "for months," intending to get a job on a cruise liner. He left when Mattie told him that she was going to contact the police, first moving the victim's own car and then driving her rental car to Florida. He told the detectives where they could find the rental car.[9]

Over the next ten days, a massive search was undertaken along the Merrimack River, but the police found no sign of the victim. Finally, on June 3, 1996, approximately five months after the victim disappeared, the police were notified that a decomposing body had been found floating near a marina in Haverhill. The marina was located near a bridge, some eight miles down river from the bridge the defendant had identified in his statement. The body was later identified through dental records as that of the victim. The victim's body was clothed only in a pair of pants. The body had no clothing above the waist, and the feet were bare. The hands, mouth, eyes, and thighs were wrapped in many yards of duct tape. Forensic testing of the duct tape around the victim's head uncovered a latent fingerprint,[10] later identified as matching the defendant's left thumb. The victim's skull had fractures radiating from one location. The medical examiner testified that the fractures were consistent with a single blow of moderate to severe force, such as a "fall from a very large height." Finding no other injury on the body, he also opined that it was unlikely that the body had traveled as far as eight miles in a river, as one would expect to see some

---

[9]The Daytona Beach police later retrieved the victim's rental car from that location.

[10]The multiple layers of duct tape were separated by freezing the tape with liquid nitrogen, and the fingerprint was found on one of the inner layers. The outer layers preserved the fingerprint from decay, water, and mud during the five months that the body was in the river.

damage from scraping along the bottom or edges of the river, or collision with structures or ice.[11]

2. *Defense witness's privilege against self-incrimination.* The defendant sought to counter the fingerprint evidence in various ways, including the suggestion that a correction officer at the jail had contrived to get the defendant's thumbprint on a piece of duct tape and that that piece of duct tape had somehow been substituted for the duct tape removed from the victim's body. In support of that theory, the defendant proposed to present testimony from Jeffrey Doucette, a fellow inmate at the house of correction, who would ostensibly testify to some interaction between the defendant and the officer involving duct tape. At the time, Doucette was facing a murder charge in connection with the death of a Lynn police officer; that murder case was being prosecuted by the same district attorney's office; and, coincidentally, the lead investigator in Doucette's case was the same detective in charge of the investigation in the defendant's case (and had taken the defendant's statement). After consulting with the attorney who represented him in the pending murder case, Doucette advised the judge that he would invoke his privilege under the Fifth Amendment to the United States Constitution and refuse to answer any questions.

The judge conducted a voir dire and concluded, over the defendant's objection, that Doucette had a legitimate basis for invoking his Fifth Amendment privilege. Specifically, the judge found that because Doucette was planning to assert a mental incapacity defense at his own trial, his ability to recall and testify about past incidents at the defendant's trial could be used against him. The judge also noted that the Commonwealth could legitimately question Doucette, on cross-examination, about his bias against the prosecution, and against the specific detective who was so closely involved in both cases. The defendant argues

[11]From the evidence of the body's location and condition, the Commonwealth argued that the victim had been dropped into the river at the bridge near the marina, an isolated spot, and not the bridge in Lawrence identified in the defendant's statement. The jury could infer that the defendant had tried to steer the investigators to that Lawrence location to prevent the discovery of the victim's body, knowing that the condition of the body would be utterly inconsistent with his claim that the victim had accidentally fallen from the bridge.

that by upholding Doucette's claim of privilege, the judge unconstitutionally deprived him of his right to present a defense. We find no error.

The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a defendant's right to present a defense, including the right to call witnesses to testify on behalf of the defense. *Commonwealth* v. *Durning*, 406 Mass. 485, 494-495 (1990), citing *Commonwealth* v. *Chappee*, 397 Mass. 508, 517 (1986). However, "[o]ne of the limitations on a defendant's right to call a witness includes the witness's proper invocation of the Fifth Amendment privilege against self-incrimination" (citation omitted). *Commonwealth* v. *Drumgold*, 423 Mass. 230, 247-248 (1996). With respect to a witness's claim of privilege, we have long held that "[a] witness may refuse to testify unless it is ' *"perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency" to incriminate' " (emphasis in original). *Commonwealth* v. *Funches*, 379 Mass. 283, 289 (1979), quoting *Hoffman* v. *United States*, 341 U.S. 479, 488 (1951). "The privilege afforded not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute . . . ." *Commonwealth* v. *Funches, supra,* quoting *Hoffman* v. *United States, supra* at 486. See *Commonwealth* v. *Martin*, 423 Mass. 496, 502 (1996); *Commonwealth* v. *Sasu*, 404 Mass. 596, 600 (1989). However, a witness's claim of privilege must be predicated on a "real risk" of incrimination, not just "a mere imaginary, remote or speculative possibility of prosecution." *Commonwealth* v. *Martin, supra,* quoting *In re Morganroth*, 718 F.2d 161, 167 (6th Cir. 1983).

Here, the risk that Doucette's proffered testimony would tend to incriminate him was far from "imaginary, remote or speculative." He was then being prosecuted for murder, facing not merely the risk but the certainty of an ongoing prosecution. His mental capacity (premised on both a "significant mental health history" and drug-induced impairment on the night of the killing) was at issue in that case. Had he testified lucidly at the

defendant's trial concerning the alleged duct tape incident, thereby demonstrating an unimpaired ability to perceive and retrieve past incidents, his ability to do so could have been used by the Commonwealth (including any expert witness called by the Commonwealth) as evidence of his actual mental capacity, and, in particular, as evidence that any mental impairment was not as severe as claimed. Thus, although Doucette would not have been "admitting" to the commission of any crime by testifying at the defendant's trial, his testimony would surely have aided the Commonwealth in his own prosecution by undermining, if not depriving him of, his defense of mental incapacity.[12] And, compounding Doucette's predicament, the fortuity of the overlap in personnel conducting the two homicide investigations meant that the Commonwealth could legitimately cross-examine him (and had announced its intention to do so) on his bias against the prosecutor, the police, and the particular detective in charge of the investigation. The defendant's argument that the judge could have limited Doucette's testimony to questions regarding the alleged duct tape incident misses the point. No matter how limited, Doucette's proffered testimony would have given the Commonwealth an opportunity to inquire about (and demonstrate) his mental and perceptive abilities, as well as any bias toward the police in general[13] or the detective who was involved in his own case.

As such, we conclude that the judge did not err in allowing Doucette to invoke his privilege against self-incrimination.

3. *Autopsy photographs.* Over the defendant's objection, the judge admitted in evidence seven autopsy photographs. The admission of photographs of homicide victims is left to the sound discretion of the trial judge, who must determine whether the inflammatory nature of the photographs outweighs their probative value. See *Commonwealth* v. *DeSouza*, 428 Mass.

---

[12]At Doucette's subsequent trial, the jury rejected the Commonwealth's theory that Doucette had acted with deliberate premeditation, but convicted him of murder in the first degree on a theory of felony-murder. We affirmed Doucette's conviction. *Commonwealth* v. *Doucette*, 430 Mass. 461, 461-462 & n.1 (1999).

[13]Although not expressly raised by Doucette's counsel in support of the claim of privilege, bias against the police might be relevant to a case involving the murder of a police officer.

667, 670 (1999), and cases cited. The defendant bears a heavy burden to demonstrate abuse of discretion in the admission of such photographs. See *Commonwealth* v. *Cardarelli*, 433 Mass. 427, 431 (2001). Indeed, "[t]his court has almost never ruled that it was error to admit photographs of crime scenes and homicide victims." *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 362 (2000), quoting *Commonwealth* v. *DeSouza*, *supra.* See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 803-804 & n.3 (2002) (no reversible error in admitting over eighty photographs, but cautioning judges that such quantity "likely to be cumulative").

All the photographs admitted in this case were highly probative of the manner and cause of the victim's death: five photographs showed the location and condition of the duct tape on the victim's body, one photograph depicted the removal of duct tape by the medical examiner, and one photograph illustrated the victim's skull fracture.[14] The duct tape wrapped around parts of the victim's body was highly probative, as it evidenced premeditation, demonstrated the falsity of the version of events set forth in the defendant's statement, and provided the basis for the fingerprint comparison. For obvious reasons, the precise location of the duct tape, and the manner in which it had been removed and processed for forensic examination, was important for the jury to understand and credit that a fingerprint could in fact be retrieved from the tape after such a long time and under such difficult conditions (a point expressly challenged by the defense). The single photograph of the victim's fractured skull was highly probative as to the cause of death, and tended to prove that the structure from which the victim had been dropped was one of considerable height.[15] We find no error in the admission of the photographs.

---

[14]Other photographs were excluded by the judge as repetitive or cumulative of the photographs that were allowed in evidence. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 804 n.3 (2002).

[15]The defendant contends that that photograph of the skull fracture should be subject to a more stringent standard because it involved an alteration of the corpse in the course of the autopsy. See *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). However, the alteration consisted of the medical examiner holding back a piece of scalp to show a portion of the fracture beneath. Obviously, the fracture could not be demonstrated at all without some degree of "alteration" to show the skull, and the extent of alteration

4. *Involuntary manslaughter instruction.* In his request for instructions, the defendant asked the judge to instruct the jury on both voluntary and involuntary manslaughter. During the charge conference, however, when the judge explained his reasons for not giving an involuntary manslaughter charge, counsel did not object but instead specified that he wanted an instruction on voluntary manslaughter. The judge refused to give any form of manslaughter instruction. On appeal, the defendant argues that the judge's refusal to give an involuntary manslaughter instruction was erroneous, and that such error created a substantial likelihood of a miscarriage of justice. We disagree.

The crime of involuntary manslaughter is not automatically a lesser included offense of murder, and an instruction on involuntary manslaughter is not required unless "[t]he traditional elements of involuntary manslaughter [are] shown by evidence that the jury might believe . . . ." *Commonwealth* v. *Sires,* 413 Mass. 292, 302-303 (1992). The difference between murder and involuntary manslaughter lies in the degree of resultant harm: murder (under the third prong of malice) requires an act creating a plain and strong likelihood of death, whereas involuntary manslaughter "involves a high degree of likelihood that substantial harm will result to another." *Id.* at 303-304 n.14, quoting *Commonwealth* v. *Welansky,* 316 Mass. 383, 399 (1944). Therefore, "[a] judge need not provide an involuntary manslaughter charge if it is clear that the risk to the victim was nothing less than a 'plain and strong likelihood that death would follow.' " *Commonwealth* v. *Diaz,* 431 Mass. 822, 831 (2000), quoting *Commonwealth* v. *Souza,* 428 Mass. 478, 493 (1998).

Here, there was no basis for an involuntary manslaughter instruction under any view of the evidence. The version of events set forth in the defendant's statement to the police — that the victim fell from the bridge accidentally during a purely verbal argument — involved no conduct on his part whatsoever, let alone any conduct posing a risk of substantial harm. The

here does not mandate exclusion of the challenged photograph. See *Commonwealth* v. *Jackson,* 428 Mass. 455, 464-465 (1998) (alteration consisted of shaving hair in area of wound so size and location of wound could be seen). The judge did not abuse his discretion in admitting this particular photograph.

version of events set forth in the defendant's statement to Mattie (and largely corroborated by the condition of the victim's body) — that the victim had been bound, gagged, and blindfolded with duct tape, weighted down, and dropped off a tall bridge into frigid water in the middle of a winter night — described conduct that could only lead to death.[16] On no conceivable view of the evidence could there be anything less than a "plain and strong likelihood that death would follow" such conduct. *Id.* Accordingly, there was no error in declining to instruct on involuntary manslaughter.[17]

5. *Consciousness of guilt and premeditation.* At the conclusion of the charge, the defendant requested that the jury be further instructed that evidence of flight or consciousness of guilt could not be used to infer premeditation.[18] The trial judge denied the defendant's request, refusing to expand on the instructions he had already given on those subjects. On appeal, the defendant claims that the judge's refusal to instruct the jury as he requested constitutes reversible error. We find no error.

Evidence of consciousness of guilt "is rarely relevant to the issue of premeditation." *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978). See *Commonwealth* v. *Palmariello*, 392 Mass. 126, 144 (1984). Cf. *Commonwealth* v. *Cohen*, 412 Mass. 375, 392 (1992) (consciousness of guilt evidence "not ordinarily relevant" to malice aforethought). However, we have not required trial judges to give an explicit instruction preventing the jury from considering evidence of consciousness of guilt in connection with issues such as deliberate premeditation or

---

[16]The judge also posited the possibility that "maybe they [*sic*] just intended to hang [the victim] over the bridge" in that condition. There was no evidence supporting that speculative hypothesis, and, as the judge correctly observed, the risk posed to the victim from such conduct ("being hung over a bridge in winter time, particularly a tall bridge over a raging river, while being bound and weighted down") is an obvious risk of death, not just a risk of substantial harm.

[17]As the judge correctly ruled, there was also no basis for a voluntary manslaughter instruction because there was no evidence of legally adequate provocation.

[18]The defendant's request for instructions submitted prior to the judge's charge had not included any request that the judge place this limitation on the jury's use of consciousness of guilt evidence.

malice aforethought.[19] Thus, where a judge gives correct instructions on consciousness of guilt and correct instructions on deliberate premeditation, there is no need to further instruct the jury as to limitations on the use of consciousness of guilt with respect to the issue of premeditation. See *Commonwealth* v. *Cohen, supra* at 392-393 (no error where judge properly instructed on consciousness of guilt and malice aforethought because "[p]resuming that the jury followed the judge's instructions . . . it was not logical for the jury to have inferred malice aforethought from the judge's instructions on consciousness of guilt").

In this case, the judge properly instructed the jury on consciousness of guilt and deliberate premeditation. The judge did not err in refusing further to instruct the jury to refrain from inferring premeditation from any evidence of the defendant's consciousness of guilt. *Id.*

6. *Review under G. L. c. 278, § 33E.* The defendant requests that we order a new trial or reduce the verdict. We have reviewed the entire record, and conclude that there are no grounds for relief under G. L. c. 278, § 33E.

*Judgment affirmed.*

---

[19]Indeed, there are situations where evidence of a defendant's postkilling conduct or consciousness of guilt can properly be used to infer premeditation. If, for example, the evidence demonstrates that plans for flight, concealment, or destruction of evidence were made prior to the actual killing, such evidence is highly probative on the issue of premeditation. See *Commonwealth* v. *Rice,* 427 Mass. 203, 209-210 (1998) (prior plan to make killing appear accidental). See also *Commonwealth* v. *Podlaski,* 377 Mass. 339, 346 (1979) (from evidence of defendant's efforts to evade apprehension, jury could infer that defendant was not too intoxicated to premeditate). Cf. *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605 (1978) (defendant's "elaborate concealment" of body not probative of premeditation "without proof that preparations were made in advance of the killing"). The defendant's suggestion that there is a blanket prohibition against using consciousness of guilt evidence to infer premeditation is an incorrect statement of law.