## Commonwealth vs. Christopher DeMarco.

Norfolk. March 11, 2005. - July 15, 2005.

Present: Marshall, C.J., Ireland, Spina, Sosman, & Cordy, JJ.

*Evidence,* Prior misconduct, State of mind, Motive, Intent. *Practice, Criminal,* Instructions to jury, Assistance of counsel, Capital case. *Constitutional Law,* Assistance of counsel. *Homicide.*

At the trial of an indictment charging the defendant with the murder of his spouse, the judge did not err by admitting evidence of the defendant's prior misconduct (specifically, the defendant's physical and emotional abuse of the victim, and the defendant's earlier extramarital conduct), where the evidence that the defendant was discontented with his marriage bore directly on the question of his motive to commit the crime; where the evidence of the defendant's hostility in the weeks and months preceding the crime increased the probative value of evidence of earlier incidents; where the judge gave forceful instructions to the jury on their use of the evidence; and where the defendant's own testimony graphically reflected the extreme abuse he inflicted on the victim before he killed her. [681-684]
Defense counsel at a murder trial did not render ineffective assistance by failing to request an instruction on involuntary manslaughter, or by failing to argue for such a verdict, where the evidence at trial did not demonstrate that the defendant was entitled to such an instruction. [684-685]

Indictment found and returned in the Superior Court Department on November 28, 2000.

The case was tried before *Isaac Borenstein,* J.

*Jeffrey L. Baler* for the defendant.

*Varsha Kukafka,* Assistant District Attorney (*Susan T. Corcoran*, Assistant District Attorney, with her) for the Commonwealth.

Marshall, C.J. On August 9, 2000, the defendant fatally strangled the victim, his wife. A Superior Court jury found the defendant guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. Represented by new counsel on appeal, the defendant, who testified at trial that he had killed the victim during a fight,

argues that the trial judge erred by admitting evidence of the defendant's prior misconduct and by failing to instruct the jury on involuntary manslaughter. He also contends that he was denied effective assistance by trial counsel's failing to argue involuntary manslaughter or to request an involuntary manslaughter instruction. Because we conclude the defendant's claims are without merit, we decline to order a new trial or to reduce the verdict pursuant to G. L. c. 278, § 33E, and affirm.

1. *Facts.* We review the facts in the light most favorable to the Commonwealth.[1] The defendant, a sergeant in the National Guard, and the victim, a branch manager for a bank, had been experiencing tension in their marriage. On the afternoon of August 9, 2000, the defendant told the victim that his pickup truck had broken down, and asked her to drive to the Stoughton armory where he worked to take him to their home in Bridgewater at the end of the work day. When she arrived at the armory, he lured her into a soundproof locker room formerly used as a firing range. There, according to his testimony, he "slammed" the victim against the steel lockers, "squeezed her face and jammed her head into the locker," "slammed" her onto the ground,[2] wrestled with her, placed his "hands around her mouth and around her throat," and got her into a "choke lock" with her face in the "pit of [his] arm" and his "arm around her neck." He testified that he knew he had "killed her."[3] A State police officer testified that the defendant admitted to placing a T-shirt over the victim's face and a plastic bag

---

[1]Our summary of the facts is drawn in part from testimony the defendant gave at trial, statements he made to the police after he was given and waived his Miranda rights, and reasonable inferences therefrom. The defendant makes no claim that the statements, which were admitted through the testimony of a police officer, were not voluntary, intelligent, and knowing.

[2]The medical examiner who conducted the autopsy of the victim's body concluded that she suffered a blow to her shoulders of a force equivalent to that of a pedestrian being hit by a motor vehicle. The medical examiner also noted extensive bruises on the victim's upper arms and thighs consistent with the use of "[s]ignificant" force, and bruises on her head caused by an object striking her with a "[s]ustaining blow."

[3]The medical examiner noted internal hemorrhages in the muscles and tissues in the victim's neck area and opined that an individual "significant" force was needed to create each hemorrhage. Extensive internal bleeding indicated that the victim suffered the injuries to her neck and other areas, see note 2, *supra*, while she was alive.

over her nose and mouth, which he held in place "for several minutes" until she stopped breathing, and that "he knew she was dead" when she urinated on the floor.[4]

The defendant made no attempt to obtain emergency medical assistance for the victim. To the contrary, he testified that he "dragged" the victim's body into her van and left the body in a parking lot at a Braintree shopping mall.[5] He then "took off" to the Braintree subway station where he "ditch[ed]" the van, and ran to the nearby Braintree armory where he had parked his pickup truck earlier in the day. The defendant drove his pickup truck back to the Stoughton armory and placed a telephone call to a neighbor to ask that he pick him up and drive him home. He told the neighbor that his pickup truck had broken down and that his wife was supposed to have picked him up but had not done so.

In the early morning of August 10, the defendant agreed to be interviewed at his house by police officers seeking a positive identification of the victim's body. One officer became suspicious when he noticed that the defendant had several scratches on his face, neck, and head, which the defendant appeared to be trying to conceal with a baseball cap pulled down on his head and a turned-up golf shirt collar covering his neck. The officer informed the defendant of his Miranda rights and obtained a signed waiver. Later that morning the defendant confessed to strangling the victim and was placed under arrest.

---

[4]At trial, the defendant denied having made the admission, although he did testify that "[t]here was urine all over the floor." Crime scene investigators recovered a bloodstained portion of a plastic bag from an area of brush beyond a fence behind the armory, where the defendant said he disposed of several items. DNA testing on the bloodstain determined that it was consistent with the victim's blood.

[5]The judge considered and properly addressed the issue whether the jury could consider the defendant's actions after the killing as evidence of consciousness of guilt from which they could infer premeditation. He instructed the jury that, "standing alone, such evidence is never enough by itself to convict a person of a crime." Although not required, see *Commonwealth* v. *Dagenais*, 437 Mass. 832, 843-844 & n.19 (2002), the judge instructed the jury that they "may not use such evidence to infer that the defendant acted with deliberate premeditation or malice, unless the Commonwealth has proven beyond a reasonable doubt that the defendant made plans prior to the death of [the victim] to engage in such conduct after her death." See *id.*, and cases cited.

The defendant denied that he had planned to kill the victim. He insisted that his pickup truck indeed was "running rough."[6] The fight occurred in the soundproof room only because he had entered the room to ensure it was empty and to shut off the lights as part of his duty to secure the armory for the night. The victim, he said, followed him into the room, and then, according to his trial testimony,[7] told him she had terminated a pregnancy in 1993 because she could not be sure whether he or the man with whom she had been having an extramarital affair was the father.[8] According to the defendant, she decided to have the abortion because she could not take the chance that the baby would be of another race. As a result of this revelation, the defendant said he "snapped" and the fatal altercation ensued.

2. *Prior misconduct.* We first consider the defendant's assertion that the judge erred in admitting evidence concerning certain alleged prior acts of misconduct because of its potential prejudicial effect. More specifically, he contends on appeal that the testimony lacked probative value because the acts occurred at indeterminate times or at times too remote from August 9, 2000. We conclude that the judge did not err in admitting evidence which the defendant now challenges.[9]

The prosecution, of course, may not introduce evidence of a defendant's prior misconduct to demonstrate bad character or

---

[6]On August 17, a State police officer drove the pickup truck a total of approximately twenty miles to and from a dealership, where a mechanic examined it. Both witnesses testified that they were unable to detect any problem with the vehicle's fuel system. Additional evidence from which the jury could have concluded that the defendant planned to kill the victim included testimony that the defendant uncharacteristically returned home during the morning of August 9, was atypically quiet during the day, made sure that other people had left the Stoughton armory before the victim arrived, spoke to the victim multiple times to determine when she would be arriving at the armory, and may have told her to enter the armory through the rear doors. There was also evidence permitting a reasonable inference that the defendant wore rubber or latex gloves during the attack.

[7]The defendant had not recounted the contents of his final conversation with the victim in any of his pretrial statements.

[8]The man named by the defendant testified that there had been no such affair.

[9]Because we conclude that the judge did not err in admitting any of the evidence, we need not determine whether the defendant adequately preserved grounds for appeal by raising timely objections to each aspect of the challenged evidence.

propensity to commit the crime charged. *Commonwealth* v. *Barrett*, 418 Mass. 788, 793 (1994). Evidence of relevant prior misconduct may be admissible for other purposes, however, such as to show intent or motive. *Id.* at 793-794. To be sufficiently probative, the evidence must be connected with the facts of the case or not be too remote in time. *Id.* at 794. Directly relevant to this case concerning the killing of a spouse are cases where we determined that "evidence of hostility close in time to the murder renders relevant earlier evidence of physical abuse of the victim by the spouse." *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 127 (2000). See *Commonwealth* v. *Gil*, 393 Mass. 204, 215 (1984) ("Evidence of a hostile relationship between a defendant and his spouse may be admitted as relevant to the defendant's motive to kill the victim spouse").

Here, the judge allowed testimony detailing three types of prior misconduct: the defendant's physical abuse of the victim[10]; the defendant's emotional abuse of the victim[11]; and the defendant's earlier extramarital conduct.[12] The challenged testimony, if credible, establishes the defendant's pattern of disrespect and hostility toward the victim that continued until the day he killed her. The evidence that the defendant was discontented with his marriage, in the pattern of this case, bears "directly on the question whether there was any motive for him to commit the crime." *Commonwealth* v. *Cormier*, 427 Mass.

[10]There was evidence that the defendant, on several occasions when he was angry, pushed the victim so hard that she almost lost her balance. There was also evidence that approximately one week before killing the victim, the defendant held her head under water in a neighbor's swimming pool for about thirty seconds.

[11]There was evidence that the defendant would yell at the victim if she cooked, rinsed dishes, or folded laundry in a manner inconsistent with his preferences. Witnesses testified that the defendant repeatedly called the victim highly derogatory or ethnically insulting names. There was testimony that the defendant sought to control the victim by telling her when to go to bed, when to shower, when she could talk on the telephone, and to change her clothes or apply makeup before going to church. He also complained about her shopping habits and long work hours.

[12]One witness testified that she had sexual relations with the defendant on several occasions from June or July, 1999, through May, 2000, which the defendant confirmed. The witness testified that, in January, 2000, the defendant told her he had fought with the victim and was going to move out because he was "sick of her bitching." Two other witnesses testified to earlier pursuits of women by the defendant in 1995-1996 and 1998-1999.

446, 450 (1998), quoting *Commonwealth* v. *Holmes*, 157 Mass. 233, 240 (1892).

Three of the witnesses saw daily interactions between the defendant and the victim for several years leading up to her death. See *Commonwealth* v. *Stroyny*, 435 Mass. 635, 642 (2002) (testimony of witnesses who saw defendant's previous acts of abuse toward victim admissible to show hostile relationship). The victim's cousin had lived with the couple as a nanny to their two young children since 1998. The victim's sisters had spent weekends and vacations with the couple since 1995 until the weekend before the killing. The witnesses testified that, within two weeks of the crime, the defendant forcefully held the victim's head under water in a swimming pool and called her derogatory names, and within one year of the crime, repeatedly abused the victim both physically and verbally while carrying on an adulterous affair. The evidence of hostility in the weeks and months preceding the crime increased the probative value of the earlier incidents. See *Commonwealth* v. *Rosenthal, supra.* See also *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355 (1957) (evidence of defendant's extramarital affair admissible where other abundant evidence of marital troubles "could be found likely to produce easily provoked and violent state of mind").

The judge forcefully instructed the jury to consider the testimony only "for the limited purposes and on the limited issues of the defendant's state of mind and his motive and intent when he allegedly committed the offense" and "for the purpose of showing the nature of the entire relationship" between the victim and the defendant. Any potential misuse of the evidence by the jury was controlled by "the judge's clear and forceful limiting instruction before any witnesses testified," *Commonwealth* v. *Gunter*, 427 Mass. 259, 263 (1998), as well as the limiting instruction he gave the jury as part of the main charge. The defendant's own testimony graphically recounted the extreme physical and verbal abuse[13] he inflicted on the victim on August 9, 2000, before he killed her, further minimizing any

---

[13]The defendant testified that he called the victim a "fucking bitch" and a "fucking cunt" during the attack at the armory. Cf. *Commonwealth* v. *Jewett*, 442 Mass. 356, 371 (2004) (testimony of fellow inmate of defendant's calling

possible prejudice from the milder accounts given by the witnesses. There was no error.

3. *Involuntary manslaughter.* We turn now to the defendant's contention that his trial counsel gave ineffective assistance by failing to request an involuntary manslaughter instruction and by failing to persuade the jury that he was guilty at most of involuntary manslaughter. He also argues that the judge erred by not issuing such an instruction sua sponte.[14]

Involuntary manslaughter is "an unintentional killing resulting from 'wanton and reckless conduct . . . [or] . . . a battery not amounting to a felony which the defendant knew or should have known endangered human life.' " *Commonwealth* v. *Tague,* 434 Mass. 510, 518 (2001), quoting *Commonwealth* v. *Pierce,* 419 Mass. 28, 33 (1994). See Model Jury Instructions on Homicide 34 (1999). An instruction on involuntary manslaughter is required where "any view of the evidence will permit a finding of manslaughter and not murder." *Commonwealth* v. *Pierce, supra.* An instruction is not required when it is "obvious that the risk of physical harm to the victim created a plain and strong likelihood that death will follow." *Id.*

The defendant was not entitled to an instruction on involuntary manslaughter. Reviewing the evidence in its light most favorable to the defendant, he testified on direct examination that he "snapped" and had not planned to kill the victim. The difficulty for the defendant is that he also testified that he could have stopped wrestling with the victim and left the armory but instead, he admitted, "I killed her . . . I choked her, and I strangled her . . . . With my hands around her mouth and around her throat; and then I had her in a choke lock." The defendant had already "slammed" the victim against steel lockers, "jammed" her head into a locker, and "slammed" her to the ground. The defendant's continuing attack by strangulation of the victim with his hands around her mouth and throat while holding her in a choke lock until she urinated on the floor cre-

victim "bitch" and "cunt," although "somewhat prejudicial" because of "obvious vulgarity," nevertheless admissible for "purpose of showing hostility toward the victim, which is relevant to motive").

[14]Over the Commonwealth's objection, the judge did instruct the jury on voluntary manslaughter based on sudden provocation. The jury rejected this theory of culpability.

ated a plain and strong likelihood that death would follow. See *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 548 (1993) (beating and strangulation created strong likelihood that death would follow).

Because the defendant was not entitled to the instruction, it follows that, by failing to request it or by failing to argue for a verdict that the evidence did not support, counsel did not provide ineffective assistance. See *Commonwealth* v. *Nardone*, 406 Mass. 123, 132 (1989) (judge should not instruct on lesser included offense not supported by reasonable view of evidence).

4. *G. L. c. 278, § 33E, review.* We have reviewed the entire record on the evidence and decline to exercise our power pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the verdict. As the judge noted at sentencing, the evidence of the defendant's guilt "was very strong" and went "well beyond a reasonable doubt." The jury found that the defendant planned the victim's murder and carried it out in what the judge characterized as "a cruel, painful, and outrageous manner."

*Judgment affirmed.*