KIAGO, COMMONWEALTH vs., 101 Mass. App. Ct. 717

 
 COMMONWEALTH vs. HELLEN KIAGO (and nine companion cases [Note 1]).

101 Mass. App. Ct. 717
 November 1, 2021 - September 20, 2022

Court Below: Superior Court, Worcester County
Present: Milkey, Kinder, & Sacks, JJ.

 

No. 20-P-959.

MassHealth. Medicaid. Hospital, Medicaid reimbursement. Larceny. Constitutional Law, Self-incrimination.

This court concluded that a provision of the Medicaid false claims statute, G. L. c. 118E, § 40 (3), which criminalizes, inter alia, the failure of healthcare providers to disclose the receipt of overpayments from the Medicaid program, did not violate the defendant's privilege against self-incrimination, where the privilege is greatly diminished in the context of a heavily regulated area, such as Medicaid, that depends on disclosure to function, in that the law targets healthcare providers generally rather than a selective group inherently suspect of criminal activities, in that the statute, despite including criminal penalties, is primarily regulatory rather than criminal, and in that the statute requires disclosures for compelling reasons unrelated to criminal law enforcement and as part of a broadly applied regulatory regime; and where the defendant had agreed to report overpayments as part of her voluntary participation in the Medicaid program. [725-732]

A Superior Court judge did not err in denying the criminal defendants' motion to suppress records obtained from a private corporation responding to a search warrant, based on the corporation's failure to comply with certain procedural requirements of the applicable statute and warrant, where exclusion for such violations is appropriate for misconduct only by government officials and not private entities. [733-734]

At a criminal trial, the judge did not err in admitting in evidence a letter from an unavailable witness, where statements in the letter were not offered for their truth but instead only to show that the defendants were on notice of potential irregularities with their billing practices and documents, a critical element of the crimes alleged; and where the jury were adequately instructed on the limited use of the letter. [734-735]

There was no merit to the criminal defendants' arguments that a regulation that formed the basis of some of the defendants' convictions was void for vagueness or that it necessitated instructing the jury that they were required to interpret the regulation against the Commonwealth pursuant to the rule of lenity. [736-737]

 Page 718 

At the trial of indictments charging violations of the Medicaid false claims statute, G. L. c. 118E, § 40, and larceny over $250 by false pretenses, a rational jury could have concluded beyond a reasonable doubt that the defendants knowingly had charged MassHealth, the State agency that administered the Medicaid program, for services rendered pursuant to a plan of care that a physician had not approved. [737-738]

Indictments found and returned in the Superior Court Department on September 28, 2017. 

 The cases were tried before Robert B. Gordon, J. 

 S. James Boumil, Jr. for the defendants.

 Susanne Reardon, Assistant Attorney General (Gregoire Ucuz, Assistant Attorney General, also present) for the Commonwealth.

 MILKEY, J. Hellen Kiago was the president and chief executive officer of Lifestream Healthcare Alliance, LLC (Lifestream). Lifestream provided various home health services, such as nursing care, and physical and occupational therapy. It obtained its revenues principally from the Massachusetts Medicaid program administered by the State agency known as MassHealth. Based on evidence of fraudulent billing practices and related conduct, a Superior Court jury found Kiago and Lifestream (collectively, the defendants) each guilty of four counts of violating the Medicaid false claims statute, G. L. c. 118E, § 40, and one count of larceny over $250 by false pretenses, G. L. c. 266, § 30. [Note 2] The defendants jointly appealed from these convictions. 

 On appeal, Kiago claims that the convictions under G. L. c. 118E, § 40 (3), violated her Federal and State constitutional protections against self-incrimination. In addition, both defendants argue that the judge erred in denying their motion to suppress and in failing to exclude certain evidence at trial; that relevant MassHealth regulations are void for vagueness or are ambiguous, implicating the doctrine of lenity; and that the evidence was legally insufficient in one respect. We affirm.

 Regulatory background. We begin with a brief summary of how the Medicaid payment system operates under applicable MassHealth regulations. [Note 3] The process begins when a home health provider, such as Lifestream, receives a patient referral from a physician. 130 Code Mass. Regs. § 403.410(A) (2016). [Note 4] Typically, a provider employee, which at Lifestream was a registered 

 Page 719 

nurse (RN), then completes a medical assessment and develops a plan of care for the patient. The plan of care specifies the type and frequency of services to be provided, as well as the type of professional to provide them. 130 Code Mass. Regs. § 403.419(B) (2016). [Note 5] This plan of care must be approved by the referring physician. Id. 

 To secure such approval, the provider is to send a copy of the plan of care -- typically done at Lifestream via electronic facsimile transmission (fax) -- to the referring physician, who approves the plan with his or her signature. 130 Code Mass. Regs. § 403.419(B). After receiving that signature, the provider can submit a claim to MassHealth. Id. In the event that a physician verbally approves the plan, the provider lawfully can submit the claim so long as it obtains a signed form within a specified timeframe. 130 Code Mass. Regs. § 403.419(D)(1) (2016). 

 The plan of care allows the patient to receive services for sixty days. For care to continue thereafter, the provider needs to recertify the plan, and that recertification also must be supported by a physician's signature. 130 Code Mass. Regs. § 403.419(A)(1) (2016). [Note 6] The same verbal authorization rules apply to the recertified plan of care. 130 Code Mass. Regs. § 403.419(D)(1). 

 Occasionally, mistakes in billing lead to overpayment of MassHealth funds to the provider. [Note 7] Should providers learn that they had billed MassHealth for money to which they were not 

 Page 720 

entitled, there are processes in place for the provider to disclose this to MassHealth. Pursuant to the regulations, "provider[s] must report in writing and return any overpayments to the MassHealth agency within 60 days of the provider identifying such overpayment," and "provider[s] must include in such written report the reason for the overpayment and use such form and follow such process that may be prescribed by the MassHealth agency." 130 Code Mass. Regs. § 450.235(B) (2015). See 130 Code Mass. Regs. § 450.260(A) (2013) ("[a] provider is liable for the prompt payment to the MassHealth agency of the full amount of any overpayments"). To meet their regulatory duties, providers are to fill out the agency's overpayment disclosure form and send the form to MassHealth. [Note 8] As discussed infra, a provider who fails to report an overpayment and fails to return the money may be prosecuted for filing a false claim so long as the Commonwealth can prove fraudulent intent. See G. L. c. 118E, § 40 (3). 

 Factual background. 1. Lifestream's reliance on Medicaid. Most of Lifestream's patients used MassHealth as their insurance. At any given time, Lifestream served about 200 MassHealth patients, and Medicaid funds from MassHealth supplied the bulk 

 Page 721 

of Lifestream's revenues.

 On April 8, 2014, Kiago signed a provider contract with MassHealth on behalf of Lifestream agreeing "to comply with all federal and state laws, regulations, and rules [pertaining to MassHealth]." Specifically, this contract required Lifestream "to furnish services . . . that conform to the requirements for such services . . . as set forth in MassHealth regulations, to furnish only those services . . . that qualify as medically necessary" as determined by the member's physician and "to keep such records as are necessary to disclose fully to MassHealth . . . the extent and medical necessity of the services . . . provided to, or prescribed for, eligible members for each claim submitted to MassHealth." In addition to maintaining paper records at its office, Lifestream used a particular computer software -- known as Kinnser software -- to store its patients' records electronically. Thus, for example, when physicians faxed to Lifestream signed plans of care, a Lifestream employee would upload the form using the Kinnser software. 

 2. Overriding what was medically necessary. We turn next to the particular conduct underlying the various indictments. In July 2015, Kiago purported to override the clinical assessment of the Lifestream RN who had assessed two patients for services with Lifestream. Specifically, Kiago directed that those patients receive more hours than the RN had determined were necessary. This became the basis of count 6 of the indictments (larceny over $250 by false pretenses). It was also the basis for one of the Medicaid false claims counts (count 1), which the Commonwealth summarized at trial as alleging that Kiago "caused false claims to be submitted above and beyond what [the RN] had assessed those patients as needing." 

 3. The "correction orders." Count 2 of the indictments was based on certain actions that Kiago took in response to issues raised by Eva DeLuca, the RN who was hired as Lifestream's administrator in July 2015. DeLuca, who reported directly to Kiago and communicated with her almost daily, became responsible for the day-to-day oversight of Lifestream. Shortly after starting her position, DeLuca became concerned about various improprieties that came to her attention. Specifically, DeLuca was concerned that Lifestream was providing home health services without signed plans of care, or in excess of what was authorized by them. For example, Lifestream billed twenty-eight hours of care per week for one patient, even though that patient's plan of 

 Page 722 

care authorized only up to fourteen hours per week. DeLuca communicated these concerns to Kiago. In response, Kiago directed DeLuca to issue "correction orders" in late 2015. These orders stated that "[d]ue to clerical error, patient inadvertently received" more hours of services than were ordered in the patient's plan of care "until [the] error was rectified." According to DeLuca, this information was false because no clerical errors in fact had been made, and because the overbillings were not in any way "inadvertent." She nevertheless sent the correction orders to physicians for their signatures. Some of the physicians refused to sign the forms. DeLuca informed Kiago of the physicians' refusals, while offering her view that Lifestream "had to return moneys to MassHealth." Kiago told DeLuca that the overbillings would be rectified, but Kiago neither disclosed the overbillings to MassHealth nor returned the money. 

 DeLuca became debilitated by the stress of the job, including "seeing and having to . . . live with" what she viewed as regulatory violations. This led to her own month-long hospitalization in October 2015, and she left her job in March 2016 shortly after Lifestream was audited. DeLuca eventually contacted the Office of the Attorney General (OAG) through its Medicaid fraud tip line and provided the Commonwealth with fifty-four of the correction orders. The allegations regarding these orders became count 2 of the indictments alleging violations of the Medicaid false claims statute. As the Commonwealth summarized to the jury at trial, count 2 was "for concealing or failing to disclose excess hours where instead correction orders were made." 

 4. Response to internal audit. DeLuca was not the only Lifestream employee concerned about improprieties in Lifestream's business practices. Another key Commonwealth witness was Christine Perez, who worked in Lifestream's billing department. In that role, Perez billed MassHealth for nurse visits and home health aide hours, and she checked whether the hours billed in fact had been approved under a plan of care. She testified that Kiago instructed her to bill MassHealth for the actual recorded hours, even if they exceeded the number that a physician had approved. Perez also learned that the home health aides did not have the required training or certifications. When she brought this to Kiago's attention, Kiago told Perez to bill for the hours regardless of the aides' lack of certifications. 

 The concerns that employees such as DeLuca and Perez had 

 Page 723 

raised about irregularities in Lifestream's billing and documentation practices, along with whether money had to be returned to MassHealth, [Note 9] were discussed at a series of internal meetings in the fall of 2015. [Note 10] Kiago eventually instructed Perez to conduct an internal audit and to create a chart showing the billing discrepancies. Perez made the requested chart and sent it to Kiago on November 24, 2015. After this internal audit, the discrepancies persisted. Perez made a second chart documenting the continued discrepancies in the spring of 2016. This report showed that Lifestream submitted claims for services that had never been authorized in a timely order signed by a physician, or that were billed in excess of what was authorized. In late April 2016, Perez provided the report to Kiago and was let go from her position that same day. The defendants did not return money to MassHealth associated with the overbillings identified in either of Perez's reports. 

 In connection with these facts, the Commonwealth charged each defendant with one count of filing Medicaid false claims (count 4). At trial, the Commonwealth asked the jury to find the defendants guilty "for concealing or failing to disclose claims submitted to MassHealth identified in the Perez report on April 27, 2016, as having not been authorized, having been signed late or having been billed at a frequency in excess of what was authorized." 

 5. External audit preparations. The remaining count of the indictments (count 3) was based on actions the defendants took in preparation for an external audit. On January 26, 2016, DeLuca received a phone call informing her that MassHealth was coming the next day to conduct a billing audit of Lifestream. During such an audit, MassHealth "check[s] that their consumers are receiving medically necessary services and that the agency is billing the same thing that [it has] orders for." DeLuca called Kiago, who responded that she would be coming into the office shortly and that the staff would be "staying late" that night. 

 Kiago, DeLuca, and two other Lifestream employees looked through the records to determine whether there were plans of care 

 Page 724 

signed by physicians, as required by 130 Code Mass. Regs. § 403.419(A)(1). According to DeLuca, "there were plenty of patients that did not have signed plans of care or signed physician orders"; another employee testified that there were 485 unsigned plans of care. Kiago instructed her employees to print the unsigned plans of care and to fax them to the physicians' offices. Per her instructions, the employees also faxed the plans of care to Lifestream's own fax number, so that a fax number would appear on the plan of care, attempting to create the appearance that the physicians had faxed the plans of care back. Kiago told DeLuca that "MassHealth wouldn't recognize that it was [Lifestream's] own fax number." 

 During this process, Kiago asked DeLuca to forge a physician's signature on a plan of care. After DeLuca refused to do so, Kiago stated that she would do it herself. She "practiced signing the physician's name, and then signed the physician's name to the plan of care." DeLuca then asked the office manager to shred the forged document. DeLuca left around 10 P.M., at which point Kiago was still reviewing files. 

 The next day, employees arrived early in the morning to continue looking through patient files. MassHealth auditors then arrived and reviewed the files for twenty-five patients. After the audit, Kiago asked the office manager to shred the plans of care on which she had forged signatures. However, the office manager saved some of the forged documents and gave them to the Commonwealth in August 2016. 

 Count 3 of the indictments alleged Medicaid false claims based on the actions the defendants took with respect to the external audit. Specifically, as summarized by the Commonwealth at trial, the Commonwealth charged the defendants with "concealing or failing to disclose claims submitted to MassHealth without physician authorization where either [Kiago] instructed Ms. DeLuca to hand write the physician's names or later instructed [a Lifestream employee] to shred the forged plan of care after the audit."

 6. Investigation. The Medicaid fraud division of the OAG began investigating Lifestream for the conduct at issue in 2016. In October 2016, the OAG invited the Office of the Inspector General to join the investigation, and on December 1, 2016, the offices jointly executed search warrants at various Lifestream offices. On that same day, two agents went to Kiago's house and interviewed her for approximately sixty to ninety minutes about Lifestream and home health care. Two days after being 

 Page 725 

interviewed by the agents, Kiago opened a bank account in her daughter's name and deposited into that account over $1 million from two Lifestream business accounts. Although the money was transferred back into a Lifestream account during the following month, Kiago thereafter wired $1 million from a Lifestream account to an account in Kenya associated with a post office box. Relying on a warrant issued to Kinnser pursuant to G. L. c. 276, § 1B, the Commonwealth's investigators obtained millions of pages of Lifestream's electronic records, which they then analyzed. They also received physical documents from Lifestream's premises (via warrant), from MassHealth (via audits and requests), and from physicians' offices (via administrative records requests).

 Discussion. 1. Compelled self-incrimination. Kiago argues that, as applied to this case, G. L. c. 118E, § 40 (3), [Note 11] violates her Fifth Amendment to the Unites States Constitution privilege against self-incrimination. [Note 12] That subsection states that it is a crime for someone who:

"having knowledge of the occurrence of any event affecting his or her initial or continued right to any such benefit or payment, or the benefit of any other individual in whose behalf he or she has applied for or is receiving such benefit or payment, conceals or fails to disclose such an event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized" (emphasis added).

G. L. c. 118E, § 40 (3). Kiago maintains that conviction pursuant to this provision punishes her for not disclosing overpayments when doing so would have exposed her to "substantial hazards of self-incrimination." California v. Byers, 402 U.S. 424, 426 (1971) (Byers). 

 Kiago first raised her Fifth Amendment challenge after the 

 Page 726 

evidence closed but before the jury began their deliberations. [Note 13] It was proper to raise an as-applied challenge to the statute at that time. [Note 14] See Commonwealth v. Jasmin, 396 Mass. 653, 655 (1986) ("a challenge to . . . a statute as applied might properly be raised before trial, but it need not be raised until the Commonwealth has presented its evidence showing the circumstances in which the statute would be applied to a defendant"). Moreover, at the point Kiago first raised the issue, the judge specifically stated that "if [Kiago's] argument is that this statute cannot be constitutionally applied to [her] because the prong of the statute that makes it a crime to knowingly retain money and not disgorge it to MassHealth, that that provision essentially requires someone to waive a [F]ifth [A]mendment privilege, your point is preserved." While Kiago no doubt could have done a better job sharpening her Fifth Amendment arguments at trial, we agree with her that her claims were preserved. The issues of law that she raises are subject to our de novo review. Commonwealth v. McGee, 472 Mass. 405, 412 (2015). If we find error, we must consider whether any error was harmless beyond a reasonable doubt. Commonwealth v. Vasquez, 456 Mass. 350, 352 (2010).

 Kiago argues that counts 2 through 4 all raise Fifth Amendment concerns. In the analysis that follows, we focus especially on count 4. That count directly poses the Fifth Amendment issue, because it is based exclusively on Kiago's failure to disclose the overpayments after being apprised of them. The reasons why Kiago's Fifth Amendment arguments ultimately fail with respect to count 4 apply as well to counts 2 and 3. In addition, we note that counts 2 and 3 are based at least in part on Kiago's affirmative acts of concealment, not just her failure to disclose the overpayments. This may provide an additional reason why Kiago's Fifth Amendment arguments fail with respect to counts 2 and 3. Cf. In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 674-675 (S.D.N.Y. 1990) (distinguishing between mere failure to 

 Page 727 

disclose and making affirmatively misleading assertions). We turn then to the merits.

 The Commonwealth highlights that to prove a violation of G. L. c. 118E, § 40 (3), it has to prove fraudulent intent. Based on this requirement, the Commonwealth argues that where a provider has voluntarily disclosed an overpayment, that provider would very unlikely be charged with having failed to disclose the overpayment up until that point in time. As Kiago points out, however, someone who makes such a self-disclosure is not automatically protected by that action, and whether a prosecution would follow is at least partly dependent on prosecutorial discretion. Moreover, the case law recognizes that the Fifth Amendment "privilege . . . not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute [the defendant]" (citation omitted). Commonwealth v. Dagenais, 437 Mass. 832, 839 (2002). Therefore, even when the information at issue does not provide direct evidence of a crime, someone generally is protected from being required to disclose it if it could lead to her prosecution. See Commonwealth v. Freeman, 442 Mass. 779, 78485 (2004). Based on a strict application of such "link in the chain" cases, Kiago has a superficially strong argument that her conviction under count 4 ran afoul of the Fifth Amendment.

 What Kiago largely ignores, however, is the case law recognizing that Fifth Amendment rights are "greatly diminished" in the context of a heavily regulated area that depends on disclosure to function. Baltimore City Dep't of Social Servs. v. Bouknight, 493 U.S. 549, 557 (1990) (Bouknight). In this context, the Supreme Court of the United States has recognized the imperative to balance "the public need on the one hand, and the individual claim to constitutional protections on the other." Byers, 402 U.S. at 427. 

 The principles underlying this approach have manifested, in part, through the development of the "required records doctrine," under which individuals can be compelled to turn over incriminating records that they have been required by law to keep. Shapiro v. United States, 335 U.S. 1, 19 (1948). See Davis v. United States, 328 U.S. 582, 590 (1946). The Supreme Judicial Court specifically has applied this doctrine in the Medicaid fraud context. See Stornanti v. Commonwealth, 389 Mass. 518, 

 Page 728 

521-522 (1983). [Note 15] In Stornanti, the president of a pharmacy refused to comply with a subpoena duces tecum issued by the Medicaid fraud control unit of the OAG because the records requested would have revealed incriminating information. Id. at 519-520. The court held that the required records exception applied and explained that the pharmacy "voluntarily chose to participate in the Medicaid program and to comply with all the 'laws, rules and regulations' of the program including record keeping and inspection requirements" (citation omitted). Id. at 524. It further stated that the pharmacy president "consented, when he voluntarily entered into an agreement with the Commonwealth to be a Medicaid provider, that his records for prescriptions and other services rendered would have to be kept and would be open to the Commonwealth for inspection." Id. at 525.

 The required records doctrine itself does not resolve the case before us, in which Kiago was charged with doing more than merely failing to turn over records that she was required to keep. The question remains, however, whether principles comparable to those that underlie the required records doctrine apply.

 Outside of the required records context, the Supreme Court has "on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." Bouknight, 493 U.S. at 556. For example, in Byers, 402 U.S. at 427, the Court upheld enforcement of California's statutory requirement that drivers of cars involved in accidents stop at the scene and provide their names and addresses. A plurality found that the risk of incrimination was too insubstantial to implicate the Fifth Amendment and noted that the statute "was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities." Id. at 430. The Supreme Court further reasoned that the statute was "directed at the public at large," and required disclosure of no inherently illegal activity (citation omitted). Id. at 430-431. See United States v. Sullivan, 274 U.S. 259 (1927) (rejecting Fifth 

 Page 729 

Amendment objection to requirement to file income tax return). Justice Harlan concurred, stating his view that the California statute in fact may occasionally compel incriminating testimony, but that the noncriminal purpose and general applicability of the statute demanded compliance even in such cases. Byers, supra at 453-458. Viewing the plurality and concurrence together, the Supreme Court itself has characterized Byers as standing for the proposition that "the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement." Bouknight, supra at 557. Cf. Stornanti, 389 Mass. at 522 n.7, quoting People v. Herbert, 108 Ill. App. 3d 143, 148 (1982), cert. denied, 459 U.S. 1204 (1983) ("[w]e cannot say that the class of all [pharmacists] participating in the Medicaid program is a 'selective group inherently suspect of criminal activities'"). 

 To be sure, it remains true that in particular areas the balancing of interests may favor a defendant, thereby allowing the invocation of the Fifth Amendment as a defense to a prosecution that is based on failing to disclose incriminating information. For example, the Supreme Court has held that the Fifth Amendment is a proper defense to a prosecution for failing to register and pay occupational tax on illegal wagering activities and for conspiracy to evade payment of the tax. See Marchetti v. United States, 390 U.S. 39, 60-61 (1968). See also Grosso v. United States, 390 U.S. 62, 66-68 (1968) (same, as to excise tax on illegal wagering activities); Haynes v. United States, 390 U.S. 85, 86-87, 97-99 (1968) (prosecution for knowingly possessing firearm that had not been registered as required by other applicable laws should have been dismissed because registration requirement violated defendant's Fifth Amendment privilege against self-incrimination). In all of these cited cases, however, the request for disclosures targeted "highly selective group[s] inherently suspect of criminal activities[,] and the privilege was applied in an area permeated with criminal statutes," not "an essentially noncriminal and regulatory area of inquiry" (quotation omitted). Byers, 402 U.S. at 430, quoting Albertson v. Subversive Activities Control Bd., 382 U.S. 70, 79 (1965). See Marchetti, supra at 47. 

 Applying the lessons of these cases, we conclude that Kiago may not invoke the privilege against self-incrimination here. First, the statute at issue, G. L. c. 118E, § 40 (3), targets MassHealth healthcare providers generally, not a "highly selective 

 Page 730 

group inherently suspect of criminal activities." Byers, 402 U.S. at 430. The disclosures required by the statute will not necessarily reveal incriminating information because, as noted, overpayments happen regularly and for mundane and innocent reasons, such as clerical errors and miscalculations. Indeed, the overpayment return form contains a checklist with potential innocent explanations. [Note 16] The required disclosures would not necessarily pertain to criminal activity or even to a "link in the chain" that could lead to a provider's prosecution. 

 Second, the statute does not regulate an activity that is "permeated with criminal statutes." Byers, 402 U.S. at 430. Although G. L. c. 118E, § 40 (3), includes criminal penalties, the activity it regulates is the making of claims for reimbursement under an insurance program. Providing health care and seeking MassHealth reimbursement is an "essentially noncriminal and regulatory area," unlike the illegal wagering in Marchetti or weapons possession in Haynes. Cf. Stornanti, 389 Mass. at 522, quoting Herbert, 108 Ill. App. 3d at 148 (Medicaid record keeping requirements serve to "monitor the operation of the Medicaid program, not to catch criminals").

 Last, the statute requires disclosures "for compelling reasons unrelated to criminal law enforcement and as part of a broadly applied regulatory regime." Bouknight, 493 U.S. at 561. General Laws c. 118E, § 40 (3), is critical to the financial integrity of an important social welfare program because it prevents fraud by knowing failure to disclose, which otherwise could go undetected and unremedied. In sum, "the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure called for by statutes like the one challenged here." Byers, 402 U.S. at 428. We thus reject Kiago's argument that her prosecution under the statute violates her privilege against self-incrimination under the Fifth Amendment and art. 12. 

 Although other statutes have similar overpayment disclosure 

 Page 731 

provisions, [Note 17] we are aware of only one other court that has considered whether such provisions violate the Fifth Amendment. That court reached the same conclusion as we do now. See People v. Kurtenbach, 204 Cal. App. 4th 1264, 1285-1286 (2012). In Kurtenbach, the defendant was convicted of concealing or knowingly failing to disclose an event affecting the right to an insurance benefit, in violation of a California insurance statute, because he did not inform his insurance carrier that damage to his property was caused by an arson that he had planned. Id. at 1282-1283. He argued that criminal prosecution for his failure to admit he had committed arson constituted an unconstitutional application of the statute in violation of his privilege against self-incrimination. Id. at 1283. Balancing the public need for disclosure against the risk of incrimination, the court rejected the defendant's argument, noting that the statute did not target a "highly selective group inherently suspect of criminal activities," did not "regulate an activity that is permeated with criminal statutes," and indeed, "requires disclosures for compelling reasons unrelated to criminal law enforcement and as part of a broadly applied regulatory regime" (quotations and citations omitted). Id. at 1285-1286. 

 Our views, like those of the Kurtenbach court, are also reinforced by a separate consideration: lack of compulsion. [Note 18] See Kurtenbach, 204 Cal. App. 4th at 1286-1287. Fifth Amendment protections apply "only when the accused is compelled to make a testimonial communication that is incriminating" (emphasis added). Fisher v. United States, 425 U.S. 391, 408 (1976). Here, although those who participated in the heavily regulated MassHealth provider program are required to disclose overpayments, there was no compulsion -- legal, financial, or otherwise -- to participate in that program. See Selective Serv. Sys. v. Minnesota Pub. Interest Research Group, 468 U.S. 841, 856857 (1984) (holding that disclosure of noncompliance with selective service registration law, required as part of voluntary application for Federal financial aid, is not compelled for Fifth Amendment 

 Page 732 

purposes). Cf. Stornanti, 389 Mass. at 525 n.11, 526 n.12 (highlighting that pharmacy president had "expressly agreed to provide the required records and to make them available to the Commonwealth" and had "voluntarily agreed to enter the Medicaid program").

 Furthermore, the Supreme Judicial Court has recognized that individuals who have entered into agreements to provide certain information may not invoke the privilege against self-incrimination to avoid disclosing such information. See Mello v. Hingham Mut. Fire Ins. Co., 421 Mass. 333, 340 (1995). In that case, after a fire at the plaintiffs' residence, one plaintiff refused to submit to an examination under oath as required by his insurance policy and G. L. c. 175, § 99, Twelfth. Id. at 334. He argued that his privilege against self-incrimination excused his noncompliance, "because he had become the subject of a criminal investigation for arson in connection with this fire." Id. The court rejected this argument, noting that "[a] person may not seek to obtain a benefit or to turn the legal process to his advantage while claiming the privilege as a way of escaping from obligations and conditions that are normally incident to the claim he makes." Id. at 338. Although Mello involved enforcement of a private contract, the court observed that the same principle applied to citizens' dealings with the government. Id. at 339. The court specifically stated that "[i]n seeking a license, applying for a position, claiming a benefit or even an entitlement, it has never been imagined that a citizen may at one and the same time make a demand on the government and refuse to supply the information that would authenticate it." Id. See, e.g., Department of Revenue v. B.P., 412 Mass. 1015, 1016 (1992) ("compelling putative father in paternity action to submit to testing or be subject to sanctions did not violate privilege"); Stornanti, 389 Mass. at 521-527. 

 Although the context at issue in Mello is, of course, different from the one before us, the larger principles recognized by the case still apply: where someone has agreed from the outset to provide relevant information as part of a quid pro quo for receiving payments to her for-profit business, she should be bound by that promise. In short, we hold that someone who has agreed to report overpayments as part of her voluntary participation in a regulatory scheme has no constitutional right to ignore that obligation in furtherance of her efforts to retain money to which she knows she is not entitled. 

 Page 733 

 2. Motion to suppress. As noted, the Commonwealth obtained various patient records through a warrant it had served on Kinnser pursuant to G. L. c. 276, § 1B. [Note 19] Prior to trial, the defendants moved to suppress these documents on the grounds that Kinnser had not complied with various requirements of the statute or of the judicially issued warrant. For example, the defendants argued that Kinnser did not produce the documents in the timeframe required by the warrant and failed to include with its transmission of the documents a record keeper affidavit certifying that they were "true and complete." See G. L. c. 276, § 1B (c) (1), (6) (requiring foreign corporations to provide all records within fourteen days of receipt of warrant and to verify authenticity of records by providing affidavit from custodian).

 On appeal, the defendants challenge the denial of their motion to suppress. To the extent that the defendants repeat their arguments about Kinnser's noncompliance with required procedures, we are unpersuaded. The exclusionary rule, on which the defendants seek to rely, targets the conduct of State officials, not private corporations such as Kinnser. See Commonwealth v. Leone, 386 Mass. 329, 333 (1982) ("Private persons are not regularly involved in law enforcement, and those who undertake searches generally do so for reasons other than to secure criminal conviction. Therefore, exclusion of the fruits of their activities will not have a significant deterrent effect"). Assuming arguendo that Kinnser did not comply with all the terms of the statute and warrant, we see no grounds on which the documents should have been suppressed. [Note 20] The judge properly denied the defendants' 

 Page 734 

motion to suppress. [Note 21]

 3. Mugo letter. The defendants next argue that the trial judge improperly admitted a letter written by Moses Mugo, Lifestream's chief financial officer, who was unavailable for trial. The letter, which was addressed to Kiago and delivered to her office, outlined various concerns that Mugo had about Lifestream's billing practices and documentation, and it requested a meeting to discuss solutions. [Note 22] The defendants argue that the letter amounted to inadmissible hearsay and violated their confrontation rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. 

 We disagree. The statements in the Mugo letter were not offered for their truth but instead only to show that the defendants were on notice of potential irregularities with Lifestream's billing practices and documents, a critical element of the crimes alleged. See Commonwealth v. Caruso, 476 Mass. 275, 295 n.15 (2017) ("If the out-of-court statement is offered for any purpose other than its truth, then it is not hearsay and the confrontation clause is not implicated"). See also Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004) ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"). [Note 23]

 Furthermore, the judge admitted the Mugo letter only after he 

 Page 735 

"carefully weighed the probative value and prejudicial effect of the evidence introduced at trial." [Note 24] Commonwealth v. Peno, 485 Mass. 378, 386 (2020). When the letter was admitted, the judge instructed the jury that they could consider the letter only for a limited purpose: "You can consider [the letter], as and to the extent you believe it bears on Ms. Kiago's knowledge and state of mind[;] [w]hat you may not consider this document as evidence of is the truth of the actual assertions made by Mr. Mugo in this document." See id. (noting that courts may consider "whether the judge mitigated the prejudicial effect through proper limiting instructions"). Then, in his final charge to the jury, the judge reminded them that with respect to some documents, they had been "cautioned that [they] could only consider the document as and to the extent . . . [they] found that it bore on [Kiago's] knowledge or state of mind, but that [they] could not consider the document for the substantive truth of what was contained in the document." He specifically referenced the Mugo letter as an example of such a document. [Note 25] We presume that the jury followed these instructions. See Commonwealth v. Collins, 92 Mass. App. Ct. 395, 401 (2017). There was no error.

 Page 736 

 4. Validity of MassHealth regulation. The defendants argue that a key MassHealth regulation, which requires a physician's signature within a specified time period, is void for vagueness. Specifically, the defendants argue that 130 Code Mass. Regs. § 403.419(D)(1) cannot be used as the basis of a criminal conviction because it is too vague to be understood by a person of ordinary intelligence. See Commonwealth v. Disler, 451 Mass. 216, 223 (2008) ("statute violates due process and is void for vagueness when individuals of normal intelligence must guess at the statute's meaning and may differ as to its application, thus denying fair notice of the proscribed conduct"). 

 The relevant regulation, 130 Code Mass. Regs. § 403.419(D)(1), states: 

"Services that are provided from the beginning of the certification period (see 130 [Code Mass. Regs. §] 403.419[C]) and before the physician signs the plan of care are considered to be provided under a plan of care established and approved by the physician if: (a) the clinical record contains a documented verbal order for the care before the services are provided; and (b) the physician signature is on the 60-day plan of care either before the claim is submitted or within 45 days after submitting a claim for that period." 

While the clarity of the regulation perhaps could be improved, we agree with the Commonwealth that -- especially when its language is read in context of the remainder of § 403.419 -- its meaning is reasonably plain: the last day for obtaining a physician's signature is forty-five days after the first claim submitted for the period. [Note 26] By contrast, the defendants' suggested interpretation, that the last day for obtaining a physician's signature is forty-five days after the day the final claim is submitted for each sixty-day period, is an unnatural reading of the regulation's language that would make little sense. We agree with the 

 Page 737 

Commonwealth that the defendants had "fair notice of the proscribed conduct." Disler, 451 Mass. at 223.

 The defendants further argue that even were the Commonwealth to have the better argument on how the regulation should be interpreted, the language nevertheless is ambiguous, and therefore must be interpreted against the Commonwealth under the doctrine of lenity. See Commonwealth v. George, 430 Mass. 276, 278-279 (1999) (rule of lenity applies only to penal statutes). The defendants' argument fails on the merits. "Even under the strict construction rule . . . 'we do not reject an available and sensible interpretation . . . in favor of a fanciful or perverse one'" (quotation and citation omitted). Id. at 279. See Commonwealth v. Graziano, 96 Mass. App. Ct. 601, 606-607 (2019) ("Because any textual ambiguity in the [relevant language] vanishes when it is viewed in context and in light of the obvious legislative purpose, the rule of lenity is not implicated"). [Note 27]

 The defendants' rule of lenity argument fares no better reframed as one that the judge erred by failing to instruct the jury that they were required to interpret the regulation against the Commonwealth. We agree with the judge that the application of the rule of lenity, as such, is a legal question outside the jury's purview. As the judge succinctly stated, "it is not the jury's role to construe the meaning of laws." To be sure, as the judge also recognized, "[w]hether the [d]efendants did, in fact, interpret the governing regulations in a manner that belies criminal intent will be a matter for the jury to evaluate, and the burden will rest upon the Commonwealth to negate any innocent intent beyond a reasonable doubt." Properly instructed on what the Commonwealth had to prove with respect to scienter, the jury found the defendants guilty. 

 5. Sufficiency of the documentary evidence. Although not labeled as such, the defendants' last argument is that the Commonwealth's evidence was legally insufficient in one respect. It is undisputed that the universe of records held by Kinnser on Lifestream's behalf included multiple versions of particular documents, such as the plans of care crafted for individual patients. Because the Commonwealth's investigators never claimed to 

 Page 738 

have looked at every plan of care included in the Kinnser documents, the defendants maintain that there theoretically might have been a signed plan of care for a patient that the Commonwealth's investigators never happened upon. For this reason, the defendants contend that the record "collection methods" employed by the Commonwealth "render[ed] it impossible for any rational jury to reliably base a conviction upon the claim of an unsigned [plan of care]."

 We are unpersuaded. Having its investigators go through the hundreds of thousands of documents at issue was not the only means of proving that a particular plan of care had not been approved. The methods through which the Commonwealth's investigators examined, analyzed, and reviewed the documents supplied by Kinnser were subjected to great scrutiny both prior to trial (during the hearing on the motion in limine) and at trial (through cross-examination). For present purposes, it suffices to say that based on the evidence that the Commonwealth presented, read in the light most favorable to the Commonwealth, see Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), a rational jury could conclude beyond a reasonable doubt that the defendants knowingly had charged MassHealth for services rendered pursuant to a plan of care that a physician had not approved.

 Conclusion. For the reasons set forth above, we affirm the judgments.

So ordered.

FOOTNOTES
[Note 1] Four against Hellen Kiago and five against Lifestream Healthcare Alliance, LLC. We refer to the individual indictments as counts. 

[Note 2] A nolle prosequi was entered on counts charging each defendant with an additional violation of G. L. c. 118E, § 40 (3). 

[Note 3] The case was tried and briefed under the regulations in effect in 2016. 

[Note 4] Title 130 Code Mass. Regs. § 403.410(A) (2016) provides: 

"Member must [b]e under the [c]are of a [p]hysician. The MassHealth agency pays for home health services only if the member's physician certifies the medical necessity for such services and establishes an individual plan of care in accordance with 130 [Code Mass. Regs. §] 403.419."

[Note 5] Title 130 Code Mass. Regs. § 403.419(B) (2016) provides: 

"Content of the [p]lan of [c]are. The orders on the plan of care must specify the nature and frequency of the services to be provided to the member, and the type of professional who must provide them. The physician must sign and date the plan of care before the home health agency submits its claim for those services to the MassHealth agency for payment, or must comply with the verbal-order provisions at 130 [Code Mass. Regs. §] 403.419(D)." 

[Note 6] Title 130 Code Mass. Regs. § 403.419(A)(1) (2016) provides: "The member's physician must establish a written plan of care. The physician must recertify, sign, and date the plan of care every 60 days." 

[Note 7] Title 130 Code Mass. Regs. § 450.235(A) (2015) provides examples of overpayments, which include payments to the provider: 

"(1) for services that were not actually provided or that were provided to a person who was not a member on the date of service;

"(2) for services that were not payable under MassHealth on the date of service, including services that were payable only when provided by a different provider type and services that were not medically necessary (as defined in 130 [Code Mass. Regs. §] 450.204);

"(3) in excess of the maximum amount properly payable for the service provided, to the extent of such excess;

"(4) for services for which payment has been or should be received from health insurers, worker's compensation insurers, other third-party payers, or members;

"(5) for services for which a provider has failed to make, maintain, or produce such records, prescriptions, and other documentary evidence as required by applicable [F]ederal and [S]tate laws and regulations and contracts;

"(6) for services provided when, as of the date of service, the provider was not a participating provider, or was in any breach or default of the provider contract;

"(7) for services billed that result in a duplicate payment; or

"(8) in an amount that a [F]ederal or [S]tate agency (other than the MassHealth agency) has determined to be an overpayment."

[Note 8] See MassHealth, Provider Overpayment Disclosure Form, https://www.mass.gov/doc/provider-overpayment-disclosure-form/download [https://perma.cc/G5ZU-2AXX]. 

[Note 9] As noted, the regulations provide a ready process through which providers can make corrections. According to Perez, returning money to MassHealth was not only possible but "pretty easy," and she had voided claims and returned money before. 

[Note 10] A letter written by another employee, Moses Mugo, was specifically discussed at that meeting. Details of this letter are reserved for later discussion. 

[Note 11] Of Kiago's Medicaid false claims convictions, three were based on G. L. c. 118E, § 40 (3), and one was based on G. L. c. 118E, § 40 (1). Kiago makes her self-incrimination argument only with respect to the three counts based on G. L. c. 118E, § 40 (3). As a corporation, Lifestream was not entitled to raise this constitutional defense. See Metro Equip. Corp. v. Commonwealth, 74 Mass. App. Ct. 63, 67 (2009). 

[Note 12] Kiago also invokes art. 12 of the Massachusetts Declaration of Rights, but besides noting that the scope of art. 12 is potentially broader, makes no specific arguments based on that provision. 

[Note 13] Kiago later raised her Fifth Amendment argument again in a formal motion filed while the jury were deliberating. The judge treated it as a motion for postverdict relief pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995), and subsequently denied it. No challenge to this procedural course is raised. 

[Note 14] At oral argument, Kiago disavowed making a facial challenge to the statute. We therefore need not reach the Commonwealth's argument that such a claim was required to be brought prior to trial. 

[Note 15] As the court said there, the required records doctrine applies when three requirements are met: "[F]irst, the purposes of [the State's] inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." Stornanti, 389 Mass. at 521-522, quoting Grosso v. United States, 390 U.S. 62, 67-68 (1968). 

[Note 16] Reasons for the overpayment that providers can check include: collection of the amount due from another insurer like Medicare or an auto or workers' compensation insurer; the claim was paid to the wrong provider or listed the wrong MassHealth member identification; the service date billed by the provider was incorrect; and the provider erroneously billed for the same service twice. See MassHealth, Provider Overpayment Disclosure Form, https://www.mass.gov/doc/provider-overpayment-disclosure-form/download [https://perma.cc/S8VM-4U7K]. 

[Note 17] See, e.g., 31 U.S.C. § 3729(a)(1)(G) (False Claims Act); 42 U.S.C. § 1320a-7k(d)(1)-(2) (Patient Protection and Affordable Care Act of 2010). 

[Note 18] Kiago suggests that the Commonwealth must prove that by entering into the Medicaid reimbursement program, she knowingly waived her rights against compelled self-incrimination. However, the issue is not whether there was a waiver of such rights, but whether the disclosure was compelled in the first place. 

[Note 19] This statute subjects out-of-State corporations that provide remote computing services, such as Kinnser, to the jurisdiction of Massachusetts courts. It implements the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 et seq. The SCA prohibits unlawful access to, and disclosure of, stored communications, but allows law enforcement to obtain the contents of electronic communications held by providers of remote computer services by obtaining a warrant "issued using State warrant procedures . . . by a court of competent jurisdiction." 18 U.S.C. § 2703(b)(A). See 18 U.S.C. § 2711(3)(B) (defining "court of competent jurisdiction" to include "a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants"). 

[Note 20] The defendants have not demonstrated how Kinnser's missteps, such as its tardiness in responding to the warrant, prejudiced them, putting aside that they did not even touch on the prejudice issue except in a one sentence footnote in their reply brief. See Boxford v. Massachusetts Highway Dep't, 458 Mass. 596, 605 n.21 (2010) (argument raised for first time in reply brief is not properly before appellate court); Mole v. University of Mass., 442 Mass. 582, 603 n.18 (2004) (argument raised only in a footnote of the brief need not be considered). 

[Note 21] As the Commonwealth highlights, the bulk of the relevant portion of the defendants' appellate brief argues that the documents produced by Kinnser were, for various reasons, unreliable. However, these claims of unreliability were not the basis of the motion to suppress. They were the subject of a motion in limine through which the defendants sought to exclude the documents. Following a two-day evidentiary hearing, the judge denied that motion, explaining in detail his grounds for doing so. The defendants have not shown how the judge's findings with respect to the reliability issues were clearly erroneous, see Commonwealth v. Carrasquillo, 489 Mass. 107, 117 (2022), or how the judge abused his discretion in ruling that the evidence was admissible if properly authenticated, see Commonwealth v. Spencer, 465 Mass. 32, 48 (2013). 

[Note 22] A witness testified that the handwritten notes in the margin of the letter matched Kiago's handwriting. 

[Note 23] To the extent the defendants argue that the letter contained evidence of Kiago's prior bad acts, it was not introduced to show Kiago's propensity to commit similar acts. Again, the letter was introduced to show notice, and thus falls outside of the prohibition on prior bad acts evidence. Commonwealth v. Crayton, 470 Mass. 228, 249 (2014), quoting Commonwealth v. Walker, 460 Mass. 590, 613 (2011) ("evidence [of prior bad acts] may be admissible for some other purpose, for instance, 'to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or pattern of operation'"). 

[Note 24] The judge made the following assessment of the letter: 

"I don't see anything in here that I consider unduly prejudicial. I see an executive officer articulating serious concerns about record keeping and the process by which Lifestream billed Medicaid. I don't consider it to be inflammatory or even remotely as accusatory as [the defendants are] characterizing it in this hearing, and I think it is clearly relevant to what Ms. Kiago understood about the state of record-keeping. This whole case has to do with largely what did Ms. Kiago understand about the state of Lifestream's record-keeping. What did she know at the time that bills were submitted to Medicaid, and what did she know at later points when she allowed Medicaid to continue retaining -- when they allowed Lifestream to continue ret[]aining moneys that had been paid to it by MassHealth on the basis of reimbursement documentation that rested on unsigned and therefore improper plans of care." 

[Note 25] The judge indicated that other documents also fell into this category but did not identify them. During their deliberations, the jury inquired whether there was a list of documents that they should not consider for the truth of the statements therein. The judge responded that there was no such list, and that the jurors would have to rely on their own memories. Especially where the judge already specifically had reminded the jury that the Mugo letter was such a document, we are unpersuaded by the defendants' argument that the judge erred by not mentioning that document again in response to the jury question. See Commonwealth v. Leahy, 445 Mass. 481, 499 (2005) ("necessity, extent, and character of supplemental instructions in response to a jury request are matters within a trial judge's discretion" [citation omitted]). 

[Note 26] As the Commonwealth highlights, the regulations expressly state that "[t]he physician must sign and date the plan of care before the home health agency submits its claim for those services." 130 Code Mass. Regs. § 403.419(B). Billing may begin before a signature is in place only where "the clinical record contains a documented verbal order for the care before the services are provided." 130 Code Mass. Regs. § 403.419(D)(1). If a verbal order is documented, the doctor still must sign the plan of care "before the claim is submitted or within 45 days after submitting a claim for that period." Id. In other words, even when there is a verbal order, the plan of care must be signed within forty-five days after the provider's first claim submission for that period. 

[Note 27] The defendants have also not demonstrated the extent to which their interpretation of the regulation would actually have assisted them. That is, they have not shown that there was a reasonable chance the jury would have acquitted them of some charges had their interpretation of the regulation been adopted. Thus, they have not demonstrated prejudice in addition to error. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.